

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00369-CV

———————————————

KARI PERKINS, KEVIN PERKINS, RICHARD MUELLER,
AND PAMELA HOLT, Appellants

V.

CITY OF GRAPEVINE, Appellee

---

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-303736-18

---

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

This case is a variation on a theme—a theme we recently explored in *Modern Builders, LLC v. City of Fort Worth*, No. 02-25-00275-CV, 2026 WL 1501055, at *1–15 (Tex. App.—Fort Worth May 28, 2026, no pet. h.).[1]

As in *Modern Builders*, a group of property owners (here, Appellants Kari Perkins, Kevin Perkins, Richard Mueller, and Pamela Holt; collectively, the Owners[2]) sued their municipality (here, Appellee City of Grapevine) over the City's adoption of two ordinances that barred the Owners from using their single-family residences as short-term rentals (STRs).[3] *See id.* at *1–4. As in *Modern Builders*, the Owners alleged that the City's adoption of the two STR Ordinances (1) violated the Texas Constitution's due course of law, equal protection, and retroactivity provisions; and (2) reflected ultra vires acts in excess of the City's authority under the Zoning Enabling Act. *See id.* at *1, *4. As in *Modern Builders*, the trial court granted summary judgment in the City's favor and awarded the City its attorney's fees. *See id.* at *4.

---

[1] The Owners' appellate counsel also represented the owners in *Modern Builders*. *See Modern Builders*, 2026 WL 1501055, at *1. The Owners acknowledge that *Modern Builders* is a "strikingly similar" case.

[2] The Owners attempt to challenge the judgment as to another property owner as well: A-1 Commercial and Residential Services, Inc. But A-1 Commercial and Residential Services, Inc. did not file a notice of appeal.

[3] We use the term "short-term rental" in the manner defined by the City in its 2024 STR Ordinance: "The rental or offer for a rental of a dwelling unit, or any portion thereof, for a period of less than 30 days[,] . . . not includ[ing] a leaseback."

And as in *Modern Builders*, the Owners appeal, reurging their complaints that the STR Ordinances violate the Texas Constitution and exceed the City's authority, and further arguing—as their counterparts did in *Modern Builders*—that awarding a municipality its attorney's fees in this type of case is unjust.[4] *See id.*

For the reasons detailed in *Modern Builders*, we will do what we did there: overrule the Owners' constitutional complaints, dismiss the Owners' ultra vires claim for want of jurisdiction, and affirm the remainder of the trial court's judgment. *See id.* at *1, *15.

## I. Background

In the 1980s, the City adopted a comprehensive zoning ordinance (the Zoning Ordinance), and for the zoning districts relevant here—those encompassing the Owners' properties—the Zoning Ordinance authorized "single-family detached dwellings" as a principal permitted use. *See City of Grapevine v. Muns*, 651 S.W.3d 317, 326, 335 (Tex. App.—Fort Worth 2021, pet. denied) (op. on reh'g). The Zoning Ordinance defined a "single-family detached dwelling[]" as "an enclosed building having accommodations for and occupied by only one family," with "family" meaning "any number of individuals living together as a single housekeeping unit interdependent upon one another." *Id.* Nothing in these definitions addressed the

---

[4]The Owners also argue—as their counterparts did in *Modern Builders*—that the trial court abused its discretion by "impliedly den[ying]" their objections to portions of the City's summary judgment evidence. *See id.* at *13. And as in *Modern Builders*, the Owners fail to show that the alleged ruling was harmful. *Id.*; *see infra note* 13.

"one family['s]" length of stay or leasing of the property. *Id.* at 326, 335–36. In other words, the Zoning Ordinance authorized a use broad enough to encompass STRs—provided the tenants were "living together as a single[, interdependent] housekeeping unit"—but it did not expressly address STRs. *Id.* at 335–37.

## A. 2018 STR Ordinance

Fast-forward to 2018, and STRs had taken the world by storm. *See Modern Builders*, 2026 WL 1501055, at *2; *Muns*, 651 S.W.3d at 327. The City conducted a ten-month "study and observation period" of the STRs operating in the City. *See Muns*, 651 S.W.3d at 327 (discussing ten-month study from 2017 to 2018). A City attorney later reported that, during the ten-month observation period, the City "witnessed a significant uptick in the complaints about the impacts [of STRs] to residential neighborhoods" and the "changes in [neighborhood] character" due to STRs' rapid "turnover[]" of guests, their "volume of noise[,] . . . regularity of noise, . . . type of noise, . . . and . . . hours of . . . noise," and their generation of increased neighborhood traffic and "parking issues."

The attorney presented these observation-period results to the City Council during a public hearing on STRs in the fall of 2018. And at the same 2018 hearing, the City Council heard testimony from numerous residents—some in favor of STRs and some against them. Many of the residents in the latter category recounted their frustrations with STRs near their homes. One individual described a nearby "party house" that crammed up to 20 people in a three-bedroom structure; another recalled

4

"endur[ing] dozens of extended weekends of yelling, loud music, and the constant loud drone of a party" coming from the STR behind her house; another explained how the STR across the street from her brought "excessive amounts of cars" that parked along the street and were "coming and going all day and all night"; another reported STR tenants' "misuse of [the] community pool and clubhouses" in his area; and others expressed safety concerns due to the stream of seemingly unvetted strangers in their neighborhoods.

Ultimately, after hearing this testimony and the observation-period results, the City Council found that

- STRs, "with their attendant traffic, parking, noise, litter, and the influx of non-residents into residential areas [were] incompatible with the intent of residential districts," incompatible with "the desires and expectations of the City's residents," and "contrary to the long-standing character of the community";

- The City police "ha[d] responded to multiple . . . noise, parking, and disturbance complaints" at STRs and the "increase in calls for service attributable to [STRs] . . . result[ed] in an additional burden on the [p]olice";

- STRs "pose[d] a risk of increased public nuisances, disruption of neighborhoods, and additional enforcement[-]related issues"; and

- Overall, STRs were neither "consistent with the character or nature of single-family residential uses" nor "suitable in residential neighborhoods," and the "adjacency of [STRs] in residential neighborhoods [wa]s harmful."

Based on these and other findings, the City adopted a 2018 STR Ordinance that prohibited STRs in residential areas,[5] imposed penalties on property owners who

---

[5] "According to the City, the [2018] STR Ordinance did not really amend the Zoning Ordinance but simply clarified and affirmed that the Zoning Ordinance did

5

violated the prohibition, and delineated procedures for enforcement.[6] *See* Grapevine, Tex., Code of Ordinances ch. 14, art. VI, §§ 14-150, 14-151 (2018); Grapevine, Tex., Ordinance 2018-065 (Sept. 4, 2018). The 2018 STR Ordinance included the City Council's express findings in a series of "whereas" clauses preceding the new code language. Grapevine, Tex., Ordinance 2018-065 (Sept. 4, 2018).

## B. Litigation and Interlocutory Appeal

The Owners had previously used their single-family residences as STRs and were not happy with the 2018 STR Ordinance. *Muns*, 651 S.W.3d at 325. They sued the City under the Declaratory Judgments Act[7] seeking declarations that, among other things, the STR Ordinances violated the Texas Constitution.

Relatively early in the litigation, the City moved for dismissal of the Owners' claims on jurisdictional grounds, and after the trial court denied the City's motion, the City brought the case before this court on interlocutory appeal. *See id.* at 325–26, 329. Although the interlocutory appeal did not wade into the merits of the parties' dispute, *see id.* at 330, it required us to clarify some of the legal underpinnings of the case.

___

not allow STRs." *Muns*, 651 S.W.3d at 327. However, in *Muns*, we rejected the City's interpretation of the Zoning Ordinance. *Id.* at 335–37.

[6]The City "allowed a 45-day conditional grace period to allow [property owners] a 'reasonable time to honor commitments that have already been made, and/or to market their home(s) for other, permitted uses.'" *Id.* at 328.

[7]In addition to the four Owners who are parties to this appeal, several other property owners participated in the lawsuit during its lifetime. And in addition to the declaratory relief discussed, the Owners also sought related injunctive relief.

6

Specifically, we clarified that (1) before 2018, "the Zoning Ordinance d[id] not prohibit STRs in the two zoning districts in which the [O]wners' properties [we]re located, so long as the renters m[e]t the Zoning Ordinance's definition of 'family'"; and (2) the Owners "d[id] not have a vested right under the Zoning Ordinance to use [their properties] as STRs." *Id.* at 336–37, 346–47 (distinguishing right to use properties as STRs from general right to lease property and holding that latter right was sufficient to plead viable due course of law claim).

With these clarifications, the case proceeded in the trial court.[8] But as it did, the City doubled down.

## C. 2024 STR Ordinance

In 2024, the City Council adopted a second STR Ordinance that reiterated the 2018 prohibition on single-family residential STRs but authorized some multifamily residences to be used as STRs if they satisfied certain requirements.[9] *See* Grapevine,

---

[8]In *Muns*, we reversed and rendered judgment dismissing the Owners' preemption claim, but we otherwise affirmed the trial court's denial of the City's plea to the jurisdiction. *Id.* at 342–43, 348. The Texas Supreme Court denied review with Justice Young concurring. *See City of Grapevine v. Muns*, 671 S.W.3d 675, 676–77 (Tex. 2023) (Young, J., concurring) (explaining that the appeal was "a less-than-ideal vehicle for resolving the constitutional issues that [we]re presented" in part because the City "c[ould] adopt new regulatory measures if it deem[ed] it necessary").

[9]The 2018 STR Ordinance used the term "[s]ingle-family dwelling transient rental" to refer to "[t]he rental or offer for rental of any dwelling or any portion of a dwelling for a period of less than 30 days." When the 2024 STR Ordinance authorized certain multifamily dwelling units to be used as STRs, it shifted to using the terms "short-term rental," "multifamily short-term rental," and "single-family short-term rental" instead. In shifting to these three new terms, the 2024 STR

7

Tex., Code of Ordinances app. D, §§ 21, 22(C)(11), 56(C) (2024); Grapevine, Tex., Ordinance 2024-007 (Jan. 16, 2024). As in 2018, the 2024 STR Ordinance came after a public hearing on the matter and included—in a series of "whereas" clauses— express findings regarding STRs' being "destructive to the residential character of single-family neighborhoods" and "[in]consistent with the character or nature of single-family residential uses," among other things. Grapevine, Tex., Ordinance 2024-007 (Jan. 16, 2024).

## D. Summary Judgment

The Owners amended their petition to account for the 2024 STR Ordinance by seeking declarations that (1) both the 2018 and 2024 STR Ordinances violated the Texas Constitution's due course of law, equal protection, and retroactivity provisions; and (2) the City's adoption of the two STR Ordinances exceeded its authority under the Zoning Enabling Act.

The parties filed cross-motions for traditional summary judgment on all of these declaratory judgment claims.[10] *See* Tex. R. Civ. P. 166a.[11] The combined summary judgment evidence[12] included, among other things:

Ordinance defined them all as involving the "rental or offer for a rental of a dwelling unit, or any portion thereof, for a period of less than 30 days," but it prohibited "single-family short-term rentals," i.e., rentals of "single-family dwelling units" for less than 30 days.

[10]The City and Owners differed not only in their interpretations of *Muns* but also in their framings of the right at issue—as a right to lease generally or a right to

8

- A transcript of the City's 2018 public meeting on STRs, reflecting the relevant City attorney's report on the City's study and observation period and the residents' testimony on the STRs in their neighborhoods;

- Copies of the 2018 and 2024 STR Ordinances, including the City Council's express findings—the "whereas" clauses—setting out the City's rationale for adopting the new code language;

- Twelve resident affidavits describing the STRs near their homes—the need for weekly police intervention due to noise issues; the effects on the residents' sleep and ability to work from home; the abnormal amounts of traffic the STRs generated; the on-street parking issues; the obstruction of sidewalks with cars; the "loud backyard parties" that interrupted nightly neighborhood strolls; and the overall effects on the neighborhoods' milieu—how the "friendly ambiance [wa]s being replaced by strangers"; and

- Deposition testimony and affidavits from each of the Owners, three of whom averred that, prior to the 2018 STR Ordinance's adoption, City employees had told them that "there were no laws against" STRs or any "restrictions and/or regulations governing the use of single-family dwelling homes as short-term rentals."

The trial court granted the City's motion for summary judgment without specifying a basis, and it ordered that the Owners take nothing on their claims. Then,

---

lease for less than 30 days—and in their characterizations of the right—as vested, settled, both, or neither.

[11]While this appeal was pending, the Texas Supreme Court amended Rule 166a. Sup. Ct. of Tex., *Final Approval of Amendments to Rule 166a of the Texas Rules of Civil Procedure*, Misc. Docket No. 26-9012 (Feb. 27, 2026). But the "amendments apply only to a motion for summary judgment filed on or after March 1, 2026," *id.*, so they are inapplicable here. All citations to Rule 166a reference the prior version.

[12]The City also offered deposition testimony and an affidavit from an expert on "transient visitors" and "tourism security," who opined that "[t]he proliferation of STRs . . . [was] incompatible with the characteristics of a community." Although the Owners objected to this evidence, the trial court did not rule on the objections.

later, the trial court awarded the City its attorney's fees under the Declaratory Judgments Act, *see* Tex. Civ. Prac. & Rem. Code § 37.009, and it entered a final judgment consolidating its rulings.

## II. Discussion

On appeal, the Owners raise arguments substantially similar to those raised by their counterparts in *Modern Builders*—they argue that (1) the STR Ordinances violate the Texas Constitution's due course of law, equal protection, and retroactivity provisions; (2) the City's adoption of the STR Ordinances was ultra vires; and (3) the trial court's award of attorney's fees was unjust.[13]

### A. Constitutional Claims

The Owners first assert that the STR Ordinances violate the Texas Constitution's due course of law, equal protection, and retroactivity provisions. *See Modern Builders*, 2026 WL 1501055, at *4–12; *see also* Tex. Const. art. XI, § 5 (providing

---

[13]The Owners also complain of the trial court's "implied[] denial" of their objections to portions of the City's summary judgment evidence. *See supra* notes 4, 12. Specifically, the Owners contend that the trial court "abused its discretion in [impliedly] admitting the [allegedly unreliable] testimony of the City's expert." *See Modern Builders*, 2026 WL 1501055, at *13 (discussing similar complaint). But even if we assume that the trial court considered the challenged evidence, the Owners make no effort on appeal to explain how or why this evidence was material to the trial court's summary judgment ruling. And as we noted in *Modern Builders*, "it is the complaining party who must demonstrate that the judgment turns on the particular evidence admitted." *Id.* (internal quotation marks omitted) (overruling property owners' complaint regarding trial court's allegedly implied ruling on summary judgment evidence and explaining that the owners "g[a]ve no explanation of the [expert] affidavit's alleged harm").

that "no . . . ordinance . . . shall contain any provision inconsistent with the Constitution of the State"). We consider these legal issues de novo. *Modern Builders*, 2026 WL 1501055, at \*4; *see City of Dickinson v. Crystal Cruise Invs., LLC*, No. 01-24-00684-CV, 2026 WL 530391, at \*5 (Tex. App.—Houston [1st Dist.] Feb. 26, 2026, no pet. h.) ("The ultimate question of whether a zoning ordinance violates due process or equal protection is a question of law, albeit one that requires us to consider the entire record.").

"A duly enacted . . . ordinance enjoys a 'strong presumption' of constitutional validity," and "[a] party challenging [its] constitutionality shoulders 'an extraordinary burden.'" *Modern Builders*, 2026 WL 1501055, at \*4 (first quoting *State v. Loe*, 692 S.W.3d 215, 227 (Tex. 2024); and then quoting *City of Brookside Village v. Comeau*, 633 S.W.2d 790, 792–93 (Tex. 1982)); *see Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 55 (Tex. 2014) (reiterating presumption and burden in retroactivity context). In our review, we are mindful that "[t]he wisdom or expediency of the law is the Legislature's [or, in this case, the City Council's] prerogative[—]not ours." *Loe*, 692 S.W.3d at 227 (quoting *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968)).

### 1.    Due Course of Law Claim

The Owners first contend that the STR Ordinances violate their substantive rights under the Texas Constitution's due course of law provision.[14] *See* Tex. Const.

---

[14]"Texas due course of law protections in Article I, § 19, for the most part, align with the protections found in the Fourteenth Amendment to the United States

art. I, § 19; *see Modern Builders*, 2026 WL 1501055, at *5–10 (addressing similar argument).

Texas's due course of law provision ensures that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges[,] or immunities . . . except by the due course of the law of the land." Tex. Const. art. I, § 19; *see Modern Builders*, 2026 WL 1501055, at *5; *Draper*, 629 S.W.3d at 785–86. To establish a due course of law claim, a plaintiff must (1) identify a vested property interest entitled to constitutional protection and (2) demonstrate that the defendant failed to provide sufficient due process in depriving the plaintiff of that constitutionally protected interest.[15] *Loe*, 692 S.W.3d at 228; *Modern Builders*, 2026 WL 1501055, at *6; *Muns*, 651 S.W.3d at 345; *see Draper*, 629 S.W.3d at 785. The Owners fail at step one: they lack a vested property interest in using their homes as STRs.

---

Constitution." *Draper v. City of Arlington*, 629 S.W.3d 777, 786 (Tex. App.—Fort Worth 2021, pet. denied); *see Modern Builders*, 2026 WL 1501055, at *5.

[15]Under *Patel v. Texas Department of Licensing & Regulation*, a plaintiff with a constitutionally protected property interest may satisfy step two by showing that either (1) the ordinance's "purpose could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the [ordinance's] actual, real-world effect . . . could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest." 469 S.W.3d 69, 87 (Tex. 2015); *Modern Builders*, 2026 WL 1501055, at *6 (quoting *Patel*). As in *Modern Builders*, the City argues that the "so burdensome" test applies only to economic regulation statutes and is inapplicable here. 2026 WL 1501055, at *6 n.17. But as in *Modern Builders*, we need not address that issue because the Owners lack a vested right to use their properties as STRs, so their due course of law claim fails at step one. *Id.* at *7 n.21; *see* Tex. R. App. P. 47.1.

12

The Owners assert that they have a vested, "fundamental," common law right to use their properties as STRs. But in *Modern Builders*, we held "that the Owners do not have a vested common-law right to use their properties as short-term rentals." *Modern Builders*, 2026 WL 1501055, at *7. And while we left open the general possibility of establishing a vested right under a preexisting statute or ordinance, *see id.* (noting that "a right to lease short-term, if it is to be called 'vested,' can be properly informed by whether that right was enshrined under a preexisting ordinance"), the Owners do not rely on that alternative. Nor could they, as we foreclosed it in *Muns*, holding that the Owners "d[id] not have a vested right under the Zoning Ordinance to use [their properties] as STRs." 651 S.W.3d at 346 (reiterating that "[p]roperty owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made" (quoting *City of Univ. Park v. Benners*, 485 S.W.2d 773, 778 (Tex. 1972)).

Because the Owners do not have a vested right—under the common law or the preexisting Zoning Ordinance—to use their single-family residences as STRs, their due course of law claim fails at step one.[16] The trial court properly granted summary judgment on this claim.

---

[16]Even if the Owners' due course of law claim had reached step two, the STR Ordinances were rationally related to a legitimate governmental interest, as we explain below. *See infra* Section II.A.2.

13

## 2. Equal Protection Claim

Next, the Owners challenge the STR Ordinances as violative of the Texas Constitution's equal protection provision.[17] *See* Tex. Const. art. I, § 3; *see Modern Builders*, 2026 WL 1501055, at \*11–12 (addressing similar argument).

To establish a violation of Texas's equal protection provision, the Owners must make several showings,[18] including a showing that the City's "challenged decision [wa]s not rationally related to a legitimate governmental purpose."[19] *Klumb*, 458 S.W.3d at 13; *see Modern Builders*, 2026 WL 1501055, at \*11 (applying rational basis standard in review of equal protection claim challenging STR ordinance); *Draper*, 629 S.W.3d at 792 (similar, explaining that "[e]conomic regulations, including zoning decisions, have traditionally been afforded only rational relation scrutiny under the equal protection clause"). This rational basis review turns on two component

---

[17]"Equal-protection challenges are analyzed the same way under both the federal and Texas Constitutions." *Modern Builders*, 2026 WL 1501055, at \*11.

[18]To establish an equal protection violation, the Owners must show that they were "treated differently from others similarly situated." *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015); *Draper*, 629 S.W.3d at 791–92. We need not address this requirement. *See* Tex. R. App. P. 47.1. Instead, we assume without deciding that the Owners' status as STR owners constitutes a class for purposes of equal protection, that they are similarly situated to owners of residential long-term rentals, and that they were "treated differently" from the owners of long-term rentals. *See Modern Builders*, 2026 WL 1501055, at \*11–12 & n.29.

[19]This requirement does not apply when a suspect classification is involved, *Klumb*, 458 S.W.3d at 13; *Draper*, 629 S.W.3d at 792, but the Owners do not claim that a suspect classification is involved.

questions: "whether the challenged action has a rational basis and whether use of the challenged classification would reasonably promote that purpose." *Klumb*, 458 S.W.3d at 13; *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 639 (Tex. 2008) (framing questions as "(1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?"); *see Draper*, 629 S.W.3d at 786 (conducting rational basis review of STR ordinance in context of due course of law claim and noting that, "[i]f it is at least 'fairly debatable' that the ordinance was rationally related to a legitimate government objective, the ordinance must be upheld"). As in *Modern Builders*, the answer to both questions is yes. *See Modern Builders*, 2026 WL 1501055, at *8–12 (holding STR ordinances had rational basis in context of due course of law claim and going on to hold that, for the same reasons, the property owners' equal protection claim failed as well).

A zoning ordinance has a rational basis when it seeks to "safeguard[] the life, health, safety, welfare, and property of . . . neighborhoods" or "minimize[es] the adverse impacts resulting from increased transient rental uses in neighborhoods that were planned, approved, and constructed for single-family residences." *Id.* at *5, *7; *see Draper*, 629 S.W.3d at 786–87, 792. In other words, preserving residential neighborhood character is a rational basis for a zoning ordinance. *See Modern Builders*, 2026 WL 1501055, at *1, *7–10; *Draper*, 629 S.W.3d at 786–87, 792. And the City identified this as one of its reasons for adopting the STR Ordinances. *See* Grapevine,

15

Tex., Ordinance 2024-007 (Jan. 16, 2024); Grapevine, Tex., Ordinance 2018-065 (Sept. 4, 2018); *see also Crystal Cruise Invs.*, 2026 WL 530391, at *7 (conducting rational basis review in due course of law context, holding record showed rational basis for STR ordinance, and pointing to City Council's findings and to ordinance's conditioning of a permit on "the residential feel and character of a vacation rental property . . . be[ing] maintained and not unnecessarily intrud[ing] upon the adjacent neighbors").

When the City adopted the 2018 STR Ordinance, it did so based on the City Council's express legislative findings that STRs, "with their attendant traffic, parking, noise, litter, and the influx of non-residents into residential areas [were] incompatible with the intent of residential districts . . . [and] contrary to the long-standing character of the community." Grapevine, Tex., Ordinance 2018-065 (Sept. 4, 2018). And when the City reiterated its prohibition on single-family residential STRs in the 2024 STR Ordinance, it again did so based on the City Council's express legislative findings that STRs were "destructive to the residential character of single-family neighborhoods" and "[in]consistent with the character or nature of single-family residential uses." Grapevine, Tex., Ordinance 2024-007 (Jan. 16, 2024). The governmental purpose reflected in these findings—the City's interest "in fostering and preserving residential communities where 'people are invested and engaged in their neighborhood and care about each other'[—]is real[,] . . . rational, and legitimate." *Modern Builders*, 2026 WL 1501055, at *9 (internal citations omitted).

16

The Owners protest, though, that the City's classification of STRs does not reasonably promote the City's goal of preserving residential neighborhood character. *Cf. Klumb*, 458 S.W.3d at 13 (stating that rational basis review examines not only "whether the challenged action has a rational basis" but also "whether use of the challenged classification would reasonably promote that purpose"). The Owners insist that STRs are residential uses (rather than commercial uses)[20] and that "banning STRs in residential districts" to retain neighborhood character is thus "nonsensical," "baseless," and "a contradiction in terms." *See Modern Builders*, 2026 WL 1501055, at *8–9 (noting similar argument).

But as we explained in *Modern Builders*, "we are[ no]t convinced that what comes down to limiting a subset of an activity contradicts preserving the broader character of that activity." *Id.* at *9. "[T]he intensity and nature of the use . . . matters" and can change "the broader character of th[e relevant] activity." *Id.* Indeed, even before *Modern Builders*, this truism was already implicit in our precedent; we had long since recognized that "the residential character of a neighborhood is threatened when a significant number of homes . . . are occupied not by permanent residents but by a stream of tenants staying a weekend, a week, or even 29 days." *Draper*, 629 S.W.3d at 792 & n.21 (internal quotation marks omitted) (reiterating that "the use of single-

---

[20]The City disputes this classification, and the Owners dedicate a sizeable portion of their appellate briefing to the matter. The label used to describe STRs is not dispositive of the Owners' claims, though, so we need not address it. *See* Tex. R. App. P. 47.1.

17

family residences as STRs can negatively affect the residential character of neighborhoods" and that "transient rentals . . . affect the essential character of a neighborhood and the stability of a community"); *see Modern Builders*, 2026 WL 1501055, at *8 (quoting *Draper*). And while the Owners may disagree, the City Council was not irrational for finding as much.[21] *See Modern Builders*, 2026 WL 1501055, at *9 ("That such a goal is not easily quantified—or even, in today's atomized society, that this goal is perhaps unlikely to (re)gain purchase—does not make it any less rational.").

Moreover, while the Owners accuse the City of using an "arbitrary" 30-day cutoff to distinguish between STRs and long-term rentals, that cutoff was not pulled from a hat, as the Owners imply.[22] For more than a half-century, the Texas

---

[21]Both on appeal and in the trial court, the Owners dispute the City's safety- and nuisance-related statistics, and they minimize the evidentiary value of the resident testimony that supported the City Council's findings. But the City's rational basis is not "subject to courtroom fact-finding." *Klumb*, 458 S.W.3d at 13; *see Draper*, 629 S.W.3d at 793–94 (holding property owners failed to show likelihood of success on equal protection challenge to STR ordinance because, although the municipality "admitted there was no 'data set' to quantify all the . . . city-council findings supporting the STR [o]rdinance," such findings "were made after considering testimony and input from citizens and other information gathered by City staff").

[22]On appeal, the Owners attack not only the distinction between STRs and long-term rentals but also the distinction between STRs in single-family residential areas and those in multifamily residential areas. But the Owners' live petition did not assert an equal protection claim based on the distinction between STRs in single- family residential areas and those in multifamily residential areas. And the Owners did not move for summary judgment on that basis or raise it in their response to the City's summary judgment motion. Such "[i]ssues not expressly presented to the trial

18

Legislature has distinguished between a person who rents sleeping accommodations for "at least 30 consecutive days" and one who rents such accommodations for a shorter period of time. Tex. Tax Code § 156.101 (providing exception to hotel tax for "[p]ermanent [r]esident"); *see* Tex. Tax Code §§ 156.001, .051–.053; Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 1, sec. 156.101, 1981 Tex. Gen. Laws 1490, 1686 (recodifying Tax Code including hotel tax exception for "a person who has the right to use or possess a room in a hotel for at least 30 consecutive days"); Act of July 30, 1959, 56th Leg., 3rd C.S., ch. 1, § 1, arts. 23.01–.02, 1959 Tex. Gen. Laws 187, 369 (imposing hotel tax but providing exception for "a permanent resident" and defining "[p]ermanent [r]esident" as an occupant with "the right to occupancy of any room or rooms in a hotel for at least thirty (30) consecutive days"); *see also Draper*, 629 S.W.3d at 792 (rejecting argument that "there was no basis for the 30-day cutoff between STRs and long-term rentals" and noting that "a rental for fewer than 30 days triggers the imposition of [statutory] hotel-occupancy taxes"). The Owners do not challenge the rationality of this legislative distinction.[23] *See Crystal Cruise Invs.*, 2026 WL 530391, at *8 (reviewing similar argument in equal protection challenge to STR ordinance and noting that the property owner did not challenge the legislature's 30-day cutoff). And

court by written motion, answer[,] or other response shall not be considered on appeal as grounds for reversal." Tex. R. Civ. P. 166a(c).

[23]In the Owners' response to the City's motion for summary judgment, they expressly stated that they were "not disputing any issues related to Hotel Occupancy Tax" or the distinction drawn therein.

the City's reliance upon it was not arbitrary. *See id.* (reviewing similar argument in equal protection challenge to STR ordinance and holding that the municipality's "reliance on the same 30-day criterion" used by the Texas Legislature "[wa]s not arbitrary or irrational").

Thus, the Owners' equal protection claim fails as a matter of law because the STR Ordinances are "rationally related to a legitimate governmental purpose." *Klumb*, 458 S.W.3d at 13; *see Modern Builders*, 2026 WL 1501055, at *8–12 (rejecting similar equal protection claim in part because the STR ordinances were rationally related to the legitimate governmental purpose of preserving neighborhood character). The trial court properly granted summary judgment on this claim.

### 3.    Retroactivity Claim

In their final constitutional claim, the Owners assert that the STR Ordinances are unconstitutionally retroactive because they upset the Owners' settled expectations that they can use their properties as STRs. *See Modern Builders*, 2026 WL 1501055, at *10–11.

The Texas Constitution prohibits retroactive laws that "upset a person's settled expectations in reasonable reliance upon the law." *Hogan v. S. Methodist Univ.*, 688 S.W.3d 852, 860 (Tex. 2024); *see* Tex. Const. art. I, § 16; *Modern Builders*, 2026 WL 1501055, at *10; *Muns*, 651 S.W.3d at 344. To assess whether a municipal ordinance is unconstitutionally retroactive, we consider three factors:    (1) the extent of the impairment; (2) the nature of the alleged right—whether the Owners had a settled and

20

reasonable expectation of the right in reliance on the law; and (3) the nature and strength of the interests the STR Ordinances serve, as evidenced by the City Council's factual findings. *See Modern Builders*, 2026 WL 1501055, at *10; *Muns*, 651 S.W.3d at 344; *see also Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 145–46 (Tex. 2010).

The first factor—the extent of the impairment—is, in the Owners' words, "straightforward." Although the City delayed enforcement of the STR Ordinances for "a 45-day conditional grace period to allow [property owners] a 'reasonable time to honor commitments that ha[d] already been made, and/or to market their home(s) for other, permitted uses,'" ultimately, the STR Ordinances prohibited the Owners from continuing to use their single-family residences as STRs. *Muns*, 651 S.W.3d at 328; *see Fire Prot. Serv., Inc. v. Survitec Survival Prods., Inc.*, 649 S.W.3d 197, 205 (Tex. 2022) (noting that "retroactivity cases have considered the period of time between a statute's enactment and effective date in weighing the degree of notice afforded and a statute's impairment of a party's rights"). A prohibition is a significant impairment. *Cf. Zaatari v. City of Austin*, 615 S.W.3d 172, 191 (Tex. App.—Austin 2019, pet. denied) (conducting retroactivity analysis of municipal ordinance banning certain types of STRs and recognizing that "[t]he elimination of a right plainly has a significant impact on that right").[24]

---

[24]The Owners heavily rely on *Zaatari v. City of Austin*, in which our sister court held that a municipal ordinance banning certain types of STRs was unconstitutionally retroactive. 615 S.W.3d at 188–92. But that opinion is not binding on us, and it involved facts materially different from those presented here. *Cf. Modern Builders*, 2026

But the question remains: an impairment of what? And the answer to this question—the second retroactivity factor—reveals that the nature and strength of the Owners' right was shaky to begin with.

As we have already explained, the Owners "do not have a vested common-law right to use their properties as [STRs]," *Modern Builders*, 2026 WL 1501055, at *7, nor do they "have a vested right under the Zoning Ordinance to use [their properties] as STRs." *Muns*, 651 S.W.3d at 346; *see Benners*, 485 S.W.2d at 776–78 (analyzing challenge to zoning ordinance that prohibited previously permitted use and explaining that "[p]roperty owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made"); *Mbogo v. City of Dallas*, No. 05-17-00879-CV, 2018 WL 3198398, at *5–6 (Tex. App.—Dallas June 29, 2018, pet. denied) (mem. op.) (analyzing retroactivity challenge to zoning ordinance; citing *Benners* for the rule "that an individual has no protected property interest in the continued use of his property for a particular purpose just because such use has commenced or a zoning classification has been made"; and noting that "the supreme court has not overruled *Benners*" and that "we are bound to follow supreme

---

WL 1501055, at *10–11 (distinguishing *Zaatari*). In *Zaatari*, the City had expressly defined and authorized STRs before it adopted the challenged ban; it acknowledged in court "that Austinites ha[d] long exercised their right to lease their property"; it adopted an ordinance banning only certain types of STRs—those that were not owner-occupied—while allowing other STRs to continue operating in the same neighborhoods; and it "made no findings to justify the ordinance's ban." 615 S.W.3d at 180–81, 188–92. None of that is the case here.

court precedent"). While "a settled right is not equivalent to a vested right,"[25] *Muns*, 651 S.W.3d at 345, the two are "closely connected," *Hogan*, 688 S.W.3d at 860, and here, the Owners' right was not "settled" for many of the same reasons that it was not "vested."[26]

When considering "the intersection of STRs and municipal regulation," we have described STRs as akin to "conditionally allowed uses."[27] *Modern Builders*, 2026 WL 1501055, at *7. And as we explained in *Muns*, the City's preexisting Zoning Ordinance did not expressly address these conditionally allowed uses. *See* 651 S.W.3d at 326, 335–37. Rather, the Zoning Ordinance allowed the Owners to use their properties as "single-family detached dwellings" occupied by "one family" without restrictions on the duration of the family's stay. *Id.* at 335–37. By not prohibiting "one[-]family" STRs, the Zoning Ordinance implicitly authorized them as part of the

---

[25]Nor is a "settled right" equivalent to an "investment-backed expectation." *Cf. Muns*, 651 S.W.3d at 338–41 (holding Owners raised a fact issue regarding their investment-backed expectation sufficient to support trial court's jurisdiction over their regulatory takings claim).

[26]When the parties came before us on interlocutory appeal, the City focused on vested rights rather than settled expectations, and because "the City ha[d] not argued that the [Owners'] pleaded rights [we]re not settled, we conclude[d] that the [Owners] ha[d] pleaded a facially valid retroactivity claim." *Id.* at 345 & n.33 (noting that, even if the City's brief could be interpreted as encompassing a settled-expectations argument, the Owners pleaded a valid claim).

[27]When the City adopted the 2024 STR Ordinance authorizing STRs in certain multifamily residential areas, it characterized them as "conditional use[s]" that required a "conditional use permit."

broader category of "single-family detached dwelling" use.[28]  *Id.* ("declin[ing] to add occupancy-duration restrictions when none [we]re there" and reiterating that "[o]rdinances regulating land use . . . [are] strictly construed against the municipality and in the landowner's favor").

But an implicit authorization is a far cry from expressly defining, regulating, and endorsing STRs.  *Cf. Zaatari*, 615 S.W.3d at 188–92.  The Zoning Ordinance's silence may have implicitly authorized the Owners' use of their properties as STRs, but it cannot be said to have "settled" those "conditionally allowed uses" so as to generate a reasonable expectation that the Owners' STR usage would continue undisturbed.  *See Modern Builders*, 2026 WL 1501055, at \*7, \*10–11; *cf. Hogan*, 688 S.W.3d at 860–63 (rejecting retroactivity complaint and explaining that, while "the rules should not change after the game has been played," in the appellant's case, "there were no settled rules" on the subject and "[t]he Legislature does not exceed its authority by resolving lingering uncertainty about the viability of a speculative, untested theory of liability on which the common law already casts considerable doubt").   And the retroactivity clause "protects only [reasonable,] 'settled expectations.'"  *Fire Prot. Serv.*, 649 S.W.3d at 204; *see Hogan*, 688 S.W.3d at 860 (noting that plaintiff's retroactivity claim required him to establish "reasonable and settled expectation").

---

[28]The Owners acknowledged as much, stating that the City had told them "there were no laws against [STRs]."

The Owners' unsettled STR expectations are no match for the third retroactivity factor: "the nature and strength of the public interest served by the [STR Ordinances] as evidenced by the [City Council's] factual findings." *Robinson*, 335 S.W.3d at 145. The City Council made legislative findings that STRs, "with their attendant traffic, parking, noise, litter, and the influx of non-residents into residential areas," were "[in]consistent with the character or nature of single-family residential uses," "incompatible with the intent of residential districts," "destructive to the residential character of single-family neighborhoods," and "contrary to the long-standing character of the community." Grapevine, Tex., Ordinance 2024-007 (Jan. 16, 2024); Grapevine, Tex., Ordinance 2018-065 (Sept. 4, 2018); *cf. Robinson*, 335 S.W.3d at 149–50 (holding public interest served by statute was "slight" and statute was unconstitutionally retroactive when "[t]he Legislature made no findings to justify" the change); *Zaatari*, 615 S.W.3d at 189 (characterizing the nature and strength of the public interest as "slight" when "the City made no findings to justify the ordinance's ban on [certain types of STR] rentals"). And the summary judgment evidence showed that these findings were not unfounded:

- At the City's 2018 public meeting on STRs, a City attorney reported that, during the City's "observation study period," it had witnessed significant "changes in [neighborhood] character" due to STRs' rapid "turnover[]" of guests, "volume of noise[,] . . . regularity of noise, . . . type of noise, . . . and . . . hours of . . . noise," and generation of increased neighborhood traffic and "parking issues."

- At the same 2018 public meeting, a City resident testified that the STR behind her home regularly "crammed" 14 people "into a 2,300 square foot house"

25

with the visitors "partying in the backyard" late into the night and interfering with her ability to sleep.

- Another resident testified at the 2018 public meeting that she lived across the street from an STR that advertised occupancy for 16 to 26 people and that resulted in "excessive amounts of cars" parked on the street and "in the neighbor's yard" with individuals "coming and going all day and all night."

- Another resident at the meeting testified that the STR next door to her home advertised "sleep[ing] 16 plus" in a home that was "about 1,800 square feet." The resident described how guests parked all along the street, narrowing it to one lane in spots.

- A summary judgment affidavit from a City resident described how an STR near his home brought in "over 600 vacationers" in six months and generated noise of "90dB+ [when] measured in [the resident's] backyard."

- Another City resident averred that he took nightly walks in his neighborhood and "often noticed loud backyard parties and lots of cars parked" at one of the homes that was being used as an STR.

- In another summary judgment affidavit, a City resident described an STR near his home that had "limited par[k]ing" but advertised for "between 17 and 23" people. He stated that the STR brought "8 to 15 cars [to] the house" at one time and resulted in "almost daily activity . . . far in excess of a normal residential property."

- In yet another affidavit, a City resident described how the house behind hers had been "turned into a party home," how her family "ha[d] endured weekend after weekend of loud groups," how there had been "as many as 12 cars parked at th[e STR] house" at one time, and how the STR's noise had interfered with her sleep.

This is but a portion of the evidence in the record, and it reinforces what we have already recognized: the City's interest in preserving its residential neighborhoods' character was "real—and rational, and legitimate." *Modern Builders*, 2026 WL 1501055, at \*9; *see Draper*, 629 S.W.3d at 792 n.21 (recognizing that "transient rentals . . . undoubtedly affect the essential character of a neighborhood

26

and the stability of a community" as "[s]hort-term tenants . . . do not participate in local government, coach little league, . . . volunteer at the library, or keep an eye on an elderly neighbor"—"they are here today and gone tomorrow"). And to this list we add a fourth descriptor: compelling. *See Robinson*, 335 S.W.3d at 146 ("There must be a compelling public interest to overcome the heavy presumption against retroactive laws.").

Because the City's compelling interest in preserving residential neighborhood character supported its impairment of the Owners' unsettled expectation that they could continue using their homes as STRs, the City's STR Ordinances did not violate the Texas Constitution's prohibition on retroactive laws, and the trial court did not err by granting the City's summary judgment motion on that claim.

We overrule the Owners' constitutional complaints.

## B. Ultra Vires Claim

In addition to their constitutional complaints, the Owners challenge the merits of the trial court's take-nothing summary judgment on their ultra vires claim.[29] But after raising this issue in their opening brief, the Owners concede in their reply brief that the trial court lacked subject matter jurisdiction over their ultra vires claim

---

[29]The City raised the jurisdictional flaw in its live answer and summary judgment motion, but it also sought summary judgment on the merits of the ultra vires claim. And when the trial court granted the City's motion for summary judgment, it ordered that the Owners "take nothing on their claims against [the City]," thereby disposing of the claim on its merits.

27

because they pleaded it against the City. *See Rancho De Los Arboles LLC v. Town of Cross Roads*, No. 02-25-00208-CV, 2026 WL 253459, at *7–8 (Tex. App.—Fort Worth Jan. 30, 2026, no pet.) (mem. op.).[30]

Indeed, "a claim of ultra vires action is . . . proper only against the appropriate government official, not the entity," as the entity "remain[s] immune from [such] suit[s]." *Modern Builders*, 2026 WL 1501055, at *12 (quoting *Rancho de Los Arboles*, 2026 WL 253459, at *7). When, as here, the plaintiffs "allege[] an improper substantive ultra vires claim against [a governmental entity]—rather than against any specified official—[the plaintiffs] ha[ve] failed to plead a justiciable ultra vires claim," and the "incurabl[e] deficien[cy] . . . deprive[s] the trial court of jurisdiction." *Rancho de Los Arboles*, 2026 WL 253459, at *7–8; *see Modern Builders*, 2026 WL 1501055, at *12. We therefore overrule the Owners' original, merits-based complaint; vacate the trial court's take-nothing judgment on the merits of the ultra vires claim; and dismiss the claim for want of jurisdiction.

## C. Award of Attorney's Fees

Finally, the Owners argue that the trial court erred by awarding the City its attorney's fees under the Declaratory Judgments Act. *See* Tex. Civ. Prac. & Rem. Code § 37.009 (authorizing a trial court to award "reasonable and necessary attorney's

---

[30]The Owners submitted their opening brief in late 2025, before our opinion in *Rancho de Los Arboles*. *See generally Rancho De Los Arboles*, 2026 WL 253459, at *1 (reflecting date of Jan. 30, 2026).

fees as are equitable and just" in "any [Declaratory Judgment] proceeding"). The Owners do not dispute the statutory basis for the fee award or the evidentiary support for the amount awarded; rather, they assert—as their counterparts did in *Modern Builders*—that "award[ing] attorney's fees against plaintiffs undertaking to enforce their constitutional rights" is "inequitable and unjust" because such a fee award would "have a severe chilling effect on citizens' assertion of potentially meritorious claims against the government." *See Modern Builders*, 2026 WL 1501055, at *14 (discussing similar argument). But we rejected that argument in *Modern Builders*. *Id.*

As we recognized there, "Texas courts have affirmed awards of attorney's fees in favor of the government in declaratory-judgment suits," and the trial court has discretion to determine whether a fee award is equitable. *Id.* Ordering citizens to pay a prevailing municipality's declaratory judgment attorney's fees is not categorically "inequitable and unjust" simply because the citizens sought to enforce their perceived constitutional rights. *See id.*

Thus, the trial court's fee award was not categorically "inequitable [or] unjust." *See id.* We overrule the Owners' final issue.

## III. Conclusion

As in *Modern Builders*, we vacate the portion of the trial court's judgment resolving the merits of the Owner's ultra vires claim, we dismiss that claim for want of jurisdiction, and we affirm all other aspects of the trial court's judgment. *See* Tex. R. App. P. 43.2(a), (e); *Modern Builders*, 2026 WL 1501055, at *15.

29

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: June 18, 2026